IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| **CATHY LYNN SCHMIDT,** | |
| Plaintiff, | **No. 10-CV-3063-DEO** |
| v. | |
| **MICHAEL J. ASTRUE,** Commissioner of Social Security, | **Memorandum and Opinion Order** |
| Defendant. | |

———————————————

## I. INTRODUCTION AND BACKGROUND

This matter is before the Court pursuant to Cathy Lynn Schmidt's (Plaintiff) request for disability benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq.

On December 3, 2009, an Administrative Law Judge (ALJ) issued a decision denying Plaintiff disability benefits. Tr. 18. On September 2, 2010, the Appeals Council denied Plaintiff's request for review. Tr. 1. On November 4, 2010, Plaintiff timely filed a complaint, requesting review, with this Court. Docket No. 1. This Court has authority to review the final decision of the Commissioner of the Social Security (Commissioner) pursuant to 42 U.S.C. § 405(g).

**II. FACTS**

The Plaintiff claims a disability onset date of March 7, 2008. Tr. 9 and 16. She was then 47. Tr. 16. Her last substantial gainful employment was as a registered nurse. As of 2005, she was only working five hour days. Tr. 279. The Plaintiff's disability insurance coverage is good through December 31, 2012.[1] Tr. 9.

The Plaintiff's initial adult function report indicates she sought disability based on Nonalcoholic Steatophepatitis (NASH),[2] Biliary Diskynesia,[3] Hypertension, high cholesterol,

---

[1] A claimant is required to have 20 quarters of coverage within the past 40-quarter period to be insured and, therefore, eligible for disability benefits. 42 U.S.C. § 416(i)(3)(B)(i); 20 C.F.R. § 404.130(b)(2).

[2] This "resembles alcoholic liver disease, but occurs in people who drink little or no alcohol. The major feature in NASH is fat in the liver, along with inflammation and damage." *Nonalcoholic Steatophepatitis*, U.S. Department of Health and Human Services; National Digestive Diseases Information Clearinghouse (NDDIC), http://digestive.niddk.nih.gov/ddiseases/pubs/nash/, last visited January 6, 2012.

[3] "[A] condition in which a person has symptoms of gallbladder stones, yet there is no evidence of stones in the gallbladder or biliary tract." *Gallstones and gallbladder disease - Introduction*, University of Maryland Medical Center, http://www.umm.edu/patiented/articles/what_gallstones_gallbladder_disease_000010_1.htm, last visited January 6, 2012.

Hypothyroidism,[4] Gastroesophageal Reflux Disease (GERD),[5] severe allergies with memory loss, Pancreatitis,[6] Depression, and chronic cough. Tr. 148. The primary symptoms Plaintiff experiences are severe pain in her abdomen and related fatigue and depression. Tr. 160-61. The Plaintiff takes Lexapro for her depression, and has taken Ultram ER, Hydrocodone, and Oxycontin for her pain. Tr. 57 and 161. As of her appeal, Plaintiff was also taking Amitriptyline for muscle relaxation, depression, and as a sleep aid, Betaine to aid in the breakdown of proteins, Dyazide and Toprol XL for high blood pressure, Nexium for acid reflux, salmon oil for high cholesterol, Synthroid for Hypothyroidism, Urosidial for NASH,

_____

[4] Hypothyroidism relates to an underactive thyroid gland and often results in a low metabolic rate, weight gain, and somnolence. Stedman's Medical Dictionary 841 (26th ed. 2006).

[5] "Gastroesophageal reflux disease (GERD) is a condition in which the stomach contents (food or liquid) leak backwards from the stomach into the esophagus (the tube from the mouth to the stomach). This action can irritate the esophagus, causing heartburn and other symptoms." *Gastroesophageal reflux disease*, Pub Med Health, http://www.ncbi.nlm.nih.gov /pubmedhealth/PMH0001311/, last visited January 4, 2012.

[6] "Pancreatitis is inflammation of the pancreas. The pancreas is a gland located behind the stomach. It releases the hormones insulin and glucagon, as well as digestive enzymes that help you digest and absorb food." *Pancreatitis*, Pub Med Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0002129/, last visited January 4, 2012.

Temazapam for insomnia, and Lyrtec, Singulair, Prednisone, and Claritin for her allergies.  Tr. 183, 201, and 208.

Prior to 2005, Plaintiff underwent numerous surgeries: a remote appendectomy[7] in 1980, ovarian cyst surgery in 1982, 1986, 1987, and 1988, a complete oophorectomy[8] in 1989, a cholecystectomy[9] with adhesiolysis[10] in 1990 and 1992, right

---

[7] An appendectomy is surgery to remove the appendix. *Appendicitis*, Mayo Clinic, http://www.mayoclinic.com/health/appendicitis/DS00274/DSECTION=treatments-and-drugs, last visited January 6, 2012.

The appendix sits at the junction of the small intestine and large intestine.  It's a thin tube about four inches long . . .  The function of the appendix is unknown." *Digestive Disorders Health Center*, WebMD, http://www.webmd.com/digestive- disorders/picture-of-the-appendix, last visited January 6, 2012.

[8] "Oophorectomy is a surgical procedure to remove one or both of your ovaries." *Oophorectomy (overy removal surgery)*, Mayo Clinic, http://www.mayoclinic.com/health/oophorectomy/MY00554, January 6, 2012.

[9] "Cholecystectomy is a surgical procedure to remove your gallbladder - a pear-shaped organ that sits just below your liver on the upper right side of your abdomen.  Your gallbladder collects and stores bile - a digestive fluid produced in the liver." *Cholecystectomy (gallbladder removal)*, Mayo Clinic, http://www.mayoclinic.com/health/cholecystectomy/MY00372, January 6, 2012.

[10] Adhesiolysis is treatment "for the removal of Pelvic Adhesions . . . through a surgical procedure." *Adhesiolysis*, feminine hygiene, http://www.femininehygiene.com/adhesiolysis-pelvic-adhesions/, last visited January 6, 2012.

hemicolectomy[11] in 1992, and a liver biopsy in 2001.  Tr. 278.
At the hearing before the ALJ in 2009, Plaintiff reported a
total of 22 abdominal surgeries since she was 18.  Tr. 65.

On April 15, 2005, Plaintiff began treatment at the
University of Iowa Hospitals and Clinics.  Tr. 285.  Dr.
Shirazi noted Plaintiff was suffering from abdominal pain,
which was "severely impacting her life" and causing her to
miss "many days of work."  Tr. 285.  Despite recent tests -
colonoscopy, CT scan,[12] two ultrasounds, and enteroclysis[13] -
no abnormalities were found.  Tr. 285.  His final impression
was "[a]bdominal pain of an unknown etiology."  Tr. 286.  It

_____

[11] A right hemicolectomy is the removal of the right side
of the colon.  "The remaining bowel is then joined together."
*Right Hemicolectomy*, Cedars-Sinai,
http://www.cedars-sinai.edu/Patients/Programs-and-Services/C
olorectal-Cancer-Center/Services-and-Treatments/Right-Hemico
lectomy.aspx, last visited January 6, 2012.

[12] "A CT scan - also called computerized tomography or
just CT - combines a series of X-ray views taken from many
different angles to produce cross-sectional images of the
bones and soft tissue inside your body."  *CT Scan*, Mayo
Clinic, http://www.mayoclinic.com/health/ct-scan/MY00309, last
visited January 6, 2012.

[13] An x-ray exam used "to study the entire length of the
small bowel, in a very controlled manner, with barium (a white
liquid that permits the visualization of the small bowel).
*Your Doctor Has Ordered: An Enteroclysis*, University of Iowa
Hospitals and Clinics, http://www.uihealthcare.com/topics/med
icaldepartments/radiology/enteroclysis/index.html, last
visited January 6, 2012.

was recommended Plaintiff be "evaluated by Psychiatry." <u>Id.</u>

On April 23, 2005, Dr. Bowdler, also of the University of Iowa, indicated an impression of Dyspareunia[14] and probable Adhesive Disease.[15]  On April 27, 2005, Dr. Johlin noted that Plaintiff reported chronic abdominal pain and concluded,

> The most disquieting feature of this pain
> is if one extrapolates that the "spells"
> that the patient was seen for by Neurology
> are pseudoseizures, and then one adds in
> all the surgeries the patient has had, one
> needs to be very concerned about the

---

[14]Dyspareunia is painful intercourse, or a "persistent or recurrent genital pain that occurs just before, during or after intercourse . . . ." *Painful intercourse (dyspareunia)*, Mayo Clinic, http://www.mayoclinic.com/health/painful-intercourse/DS01044, last visited January 6, 2012.

[15] Adhesive Disease indicates the presence of pelvic adhesions, which can "cause many problems for millions of women.  From obstructed tubes associated with infertility, to pelvic tenderness, and painful intercourse, to chronic pelvic pain . . .  The causes of adhesions are multiple but basically the tissue irritation that produces the adhesive process arises from an inflammatory event, or from trauma (i.e. post surgical)."  J. Glenn Bradley, M.D., *Pelvic Adhesions*, OBGYN.net, http://hcp.obgyn.net/laparoscopy/content/article/1760982/1885089, January 6, 2012.
 "An adhesion is a band of scar tissue that binds 2 parts of your tissue together. . .  Abdominal adhesions are a common complication of surgery, occurring in up to 93% of people who undergo abdominal or pelvic surgery."  Eugene Hardin, M.D. and Christopher R. Westfall, D.O., *Adhesions, General and After Surgery*, emedicine health, available at http://www.emedicinehealth.com/adhesions_general_and_after_surgery/article_em.htm, last visited August 2, 2011.

> potential that she may have a somatoform[16]
> component to her illness. This would
> explain why she gets very little pain
> relief with narcotics or even topical
> anesthetics or injectable anesthetics.

Tr. 280.

In July of 2005, Plaintiff underwent surgery for
abdominal adhesions. Tr. 264. "It was a complicated
hospitalization lasting eighteen days, associated with
pneumonia, pleural effusions,[17] which required thoracentesis,[18]
and pericardial effusion."[19] Id. The surgical report noted

---

[16] "Somatoform disorders represent a group of disorders
characterized by physical symptoms suggesting a medical
disorder. However, somatoform disorders represent a
psychiatric condition because the physical symptoms present in
the disorder cannot be fully explained by a medical disorder,
substance abuse, or another mental disorder . . . Often, the
medical symptoms patients experience may be from both medical
and a psychiatric illnesses." William R. Yates, M.D.,
*Somatoform Disorders*, Medscape, http://emedicine.medscape.com/
article/294908-overview, January 6, 2012.

[17] "A pleural effusion is a buildup of fluid between the
layers of tissue that line the lungs and chest cavity."
*Pleural effusion*, Pub Med Health, http://www.ncbi.nlm.nih.gov/
pubmedhealth/PMH0001150/, last visited January 6, 2012.

[18] "Thoracentesis is a procedure to remove fluid from the
space between the lungs and the chest wall called the pleural
space. It is done with a needle (and sometimes a plastic
catheter) inserted through the chest wall." *Thoracentesis*,
WebMD, http://www.webmd.com/lung/thoracentesis, last visited
January 6, 2012.

[19] "Pericardial effusion is the accumulation of excess
fluid around the heart." *Pericardial effusion*, Mayo Clinic,
http://www.mayoclinic.com/health/pericardial-effusion/DS01124,

"[m]any dense adhesions of both the large and small bowel to the anterior abdominal wall." Tr. 295. Three months after surgery, Dr. Thepjatri followed up with Plaintiff. Tr. 291. He indicated she was "doing well" and suffered from no "abdominal pain." Id.

On July 21, 2006, Plaintiff visited the Mayo Clinic. Tr. 262. Dr. Park indicated an initial impression of chronic cough, Eosinophilic Bronchitis,[20] GERD, persistent despite medication, elevated liver function tests, a left parotid[21] nodule, memory loss, and pulmonary nodules. Tr. 262-63. An August 9, 2006, Mayo Clinic radiology report indicates Plaintiff had scattered linear atelectasis[22] and an "[e]nlarged

───────────────

last visited January 6, 2012.

[20] "Eosinophilic bronchitis without asthma (EBWA) is characterized by cough for at least 2 months, sputum eosinophil count greater than 3%, and no evidence of airway obstruction." Jussi J. Saukkonen, M.D., *Pulmonary Eosinophilia*, Medscape Reference, available at http://emedicine.medscape.com/article/301070-overview, last visited January 6, 2012.

[21] The parotid gland is one of three primary salivary glands in the human body. See *Salivary Gland Cancer*, Mayo Clinic, http://www.mayoclinic.com/health/salivary-gland-cancer /DS00708, last visited January 6, 2012.

[22] "Atelectasis is the collapse of part or (much less commonly) all of a lung." *Atelectasis*, Pub Med Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001130/, last visited January 6, 2012.

diffusely fatty liver." Tr. 253.

Dr. Petty of the Mayo Clinic determined there was no observable neurological cause of Plaintiff's memory loss. Tr. 257. Dr. Park added,

> I cannot explain the memory loss at this time. It is unusual for allergies to cause memory loss. It is rather curious that her memory loss is more seasonal in nature, which makes dementia less likely. One consideration may be cirrhosis, possibly when she takes the Zyrtec or Singulair she decompensates and becomes much more confused however this seem[s] less likely also . . . One other consideration may be a migraine equivalent which possibly the seasonal allergies does trigger.

Tr. 273.

Dr. Koeg of the Mayo Clinic indicated Plaintiff's CT scans of her lungs were unremarkable other than "a few tiny pulmonary nodules" and "some changes of atelectasis," though Plaintiff was experiencing 8 to 10 coughing fits a day. Tr. 264. A pulmonary function test also came back with a normal range of results. Id. Dr. Park concluded,

> I suspect the cough is multifactorial in nature. My leading diagnosis is habit cough, however the dyspnea[23] on exertion, recent CT by report showing a right lower

---

[23] "Dyspnea is a sign of serious disease of the airway, lungs, or heart." *Definition of Dyspnea*, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=3145, last visited January 6, 2012.

9

> lobe infiltrate, and previous pericardial
> effusion may be other leading diagnoses for
> this persistent cough.

Tr. 272.

On May 18, 2007, Plaintiff was admitted to the Trinity Regional Medical Center (Trinity) in Fort Dodge, Iowa, for possible acute hepatitis.[24] Tr. 387. Food seemed to aggravate her pain, and she was nauseous. Tr. 389.

On August 15, 2007, Plaintiff was again admitted to Trinity. Tr. 379. Plaintiff arrived reporting a "constant and stabbing" pain in her upper right quadrant due to her NASH. Id. She was unable to eat upon admission. Id.

On September 27, 2007, Plaintiff was again admitted to Trinity with intractable abdominal pain "associated with slightly elevated liver enzymes." Tr. 366. When admitted, she had difficulty eating. Id. Dr. Lorentson indicated Plaintiff needed to "vigorously work on weight reduction." Upon admittance, she had a body mass index of 28 and needed to reach a 22 or 23 to be healthy. Id.

---

[24] "Hepatitis is swelling and inflammation of the liver." *Hepatitis*, Pub Med Health, http://www.ncbi.nlm.nih.gov/pubmed health/PMH0002139/, last visited January 6, 2012.

On October 9, 2007, Dr. Johlin, a liver expert at the University of Iowa, saw Plaintiff for right upper quadrant pain and enlarged and fatty liver. Tr. 298. He indicated Plaintiff was not following her diet and exercise plan as agreed upon during her last visit. Tr. 298.

On November 23, 2007, Plaintiff was again admitted to Trinity with "severe right upper quadrant pain of long-standing character with intermittent exacerbations . . . ." Tr. 356. Her increase and decrease in pain corresponded to an expected rise and fall in liver functions. Id. Dr. Marner examined Plaintiff on her second day in the hospital and noted "[i]t is really unusual to have this degree of pain with this syndrome, although Dr. Johlin indicates that this at times can be the case." Tr. 360. She was not discharged until December 2, 2007. Id.

On February 4, 2008, Plaintiff again visited Dr. Johlin for pain, ranging from "moderately severe to horribly severe in its intensity." Tr. 307. Dr. Johlin noted Plaintiff had gained 4 pounds since he last saw her. Id Dr. Johlin informed Plaintiff liver cirrhosis was "completely avoidable" with a proper diet. Tr. 309. In conclusion, Dr. Johlin noted,

> She needs to get rid of the sweets and
> starches from the diet, convert to fruits
> and vegetables and completely get rid of
> nonabsorbable fats and carbonated
> beverages. It is difficult to understand
> how someone who has required as many
> hospitalizations as she has, was already in
> the past demonstrated that achieving her
> ideal body weight stops the pain cycles,
> would not be motivated to improve her
> muscle mass and her exercise tolerance to
> avoid all of her pain and suffering.

Id.

On February 26, 2008, the Plaintiff was yet again hospitalized with upper right quadrant pain, nausea, and vomiting. Tr. 347. Staff initiated fluid hydration upon arrival. Id. Dr. Lorentson noted, upon discharge, that Plaintiff appeared committed to vigorously working on weight reduction, which should help with her NASH and her abdominal pain. Id.

On March 20, 2008, Dr. Lorentson wrote to the Social Services Administration on behalf of Plaintiff. Tr. 411. Dr. Lorentson noted Plaintiff had "severe intractable abdominal pain due to her [NASH] over the past year . . . which has limited her ability to work and enjoy life." Id. Dr. Lorentson continued to note that Plaintiff had nearly full functional capacity when well but had nearly no functional capacity when subject to a bout of abdominal pain, which were,

"unfortunately quite frequent." Id. He concluded,

> [t]hese episodes of abdominal pain come on
> unpredictably and because of this have
> interfered with her ability to work.
> Vigorous efforts here in Fort Dodge and
> with the counseled assistance of Dr. Jolin
> at the University of Iowa have not been
> able to resolve her problems with severe
> abdominal pain and disability due to this.
> I believe that it is appropriate to
> consider her as totally disabled until we
> can better control [her] intractable
> abdominal pain.

Id.

On May 1, 2008, Dr. Rogers conducted a psychological assessment of the Plaintiff at the request of Disability Determination Services. Tr. 450. In terms of his interview with Plaintiff, Dr. Rogers indicated her "[i]mmediate retention was good and she had no problems with recall of personal information or recent and remote data." She "had fair ability to comprehend and express abstract concepts . . . She did poorly with simple, mental calculations and such tasks as serial sevens." Tr. 451. Dr. Rogers concluded,

> Present mental status and history as
> presented by [Plaintiff] are consistent
> with depression caused by difficulty
> adjusting to chronic pain and inability to
> work. She has some hysteroid and passive-
> dependant personality traits,[25] but they do

---

[25] "The essential feature of Dependent Personality
Disorder is a pervasive and excessive need to be taken care of

not appear severe enough to account for her
pain and might actually be an effect of
chronic pain.

She is able to understand and remember
instructions, procedures, and locations.
Her pace is likely poor and even though
concentration is adequate, she cannot
concentrate well enough to be reliable in
carrying out instructions. For brief
periods she is able to interact
appropriately with supervisors, coworkers,
and the public. Judgment is good and she
would adjust adequately to changes in the
workplace except that adjustment would be
compromised by her constant pain.

Tr. 452.

On May 28, 2008, disability determination consultant, Dr.
Notch, assessed Plaintiff's mental RFC for disability
services. Tr. 467-69. Dr. Notch indicated Plaintiff had no
significant limitations in understanding and memory, social
interaction, and adaptation. Tr. 467-68. He also determined
Plaintiff had some moderate limitations in her sustained
concentration and persistence, including the ability to carry
out detailed instructions, the ability to maintain attention

---

that leads to submissive and clinging behavior and fears of
separation. This pattern begins by early adulthood and is
present in a variety of contexts. The dependent and
submissive behaviors are designed to elicit caregiving and
arise from a self-perception of being unable to function
adequately without the help of others." American Psychiatric
Association, *Diagnostic and Statistical Manual of Mental
Disorders*, 721 (4th ed., Text Revision 2000).

and concentration for extended periods, and the ability to perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances. Tr. 467. Dr. Notch did not examine the Plaintiff.

On May 29, 2008, disability determination consultant, Dr. Wilson, assessed Plaintiff's physical RFC for disability services. Tr. 472-78. Dr. Wilson determined Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand, sit, and/or walk about 6 hours in an 8 hour workday, and push and/or pull an unlimited amount. Tr. 472. Dr. Wilson indicated Plaintiff could frequently balance, stoop, kneel, crouch, and crawl but could only climb stairs occasionally. Dr. Wilson also indicated Plaintiff had no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations other than she should avoid hazard, such as machinery and heights, due to her "spells or pseudoseizures." Id. Dr. Wilson did not examine Plaintiff and indicated there were no statements regarding the claimant's physical capacities on file. Tr. 477. In his analysis, Dr. Wilson surmised Plaintiff's allegations were "only partially credible," citing questions related to the somatic features of her pain, that liver functioning did not

correlate with her symptoms, and her consistent non-compliance with doctors' recommended diet and exercise.  Tr. 478.

On June 3, 2008, Plaintiff came in for a check-up with Dr. Lorentson.  Tr. 496.  His notes indicate she had seen a nutritionist and had started a diet and exercise program.  Id. They also indicate she was following the program "vigorously" and seemed to be having "some success."  Id.  On June 29, 2008, Plaintiff was again hospitalized for a recurrence of her right upper quadrant abdominal pain.  Tr. 490.  In a follow-up exam, Dr. Lorentson indicated the "abdominal pain was still with her."  Tr. 500.

On January 11, 2009, Plaintiff was again hospitalized. Dr. Schminke noted the Emergency Room determined "she would benefit from hospitalization and some symptomatic treatment to try to settle down her nausea and vomiting." Tr. 539 Plaintiff had 11 loose stools in a day, difficulty eating, and a high temperature of 104 degrees Fahrenheit.  Tr. 537.

In an adult function report, Plaintiff indicated her impairments interfered with her ability to stand, reach, walk, remember, complete tasks, concentrate, and get along with others.  Tr. 171.  In a subsequent adult function report, Plaintiff indicated her impairments were also beginning to

interfere with her ability to lift, bend, hear, climb stairs, understand, and follow instructions. Tr. 199.

On November 3, 2009, the ALJ conducted a hearing in which Plaintiff testified. Tr. 50-70. Plaintiff claimed her NASH caused her severe pain in her right upper quadrant. Tr. 55. On bad days, the pain travels to her back and shoulder blade. Id. Plaintiff described her pain as relatively constant but also described periods of severe pain 3 to 4 times a month for 4 to 5 days at a time. Tr. 56. The pain was described as "severe . . . like somebody is stabbing you and running a knife back and forth." Tr. 55. On the bad days, she is completely debilitated. Tr. 56. Her pain causes deficits in her ability to focus on things, and she lacks the energy to get up and go to work. Tr. 64.

The Plaintiff also testified about her allergies, indicating she is "allergic to dogs, cats, horses, dust, dust mites, molds, foods, [and] medications." Tr. 58. Her allergies can be so severe that there are times she does not remember who her husband is, who her dog is, who her kids are, where she is at, and what she is doing. Id. In the Fall and Spring, she gets little hives on her face and her ears turn red. Tr. 59.

As to her physical limitations, on good days, Plaintiff indicated she could walk for 15 minutes before needing a rest, could stand for a half an hour to 45 minutes, and could sit for about an hour. Tr. 59-61. On bad days, she could only walk as far as the bedroom to the bathroom and would not venture outside, stand for a half an hour to 45 minutes at a time, and sit 10 to 15 minutes. Tr. 59-61. She reported being able to lift 10 pounds occasionally, being unable to lift her hands above her head, and having a limited capacity to bend over. Tr. 63. When asked why she was able to perform her past work as a nurse though her condition had pre-dated the time she was fired, she indicated that her pain had progressively gotten worse. Id.

## III.  LAW AND ANALYSIS

In order for a plaintiff to qualify for disability benefits, they must demonstrate they have a disability as defined in the Social Security Act (the "Act"). The Act defines a disability as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(1)(A).

**A. The ALJ's Decision**

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to benefits. 20 C.F.R. § 404.1520. The five successive steps are: (1) determination of whether Plaintiff is engaged in "substantial gainful activity," (2) determination of whether Plaintiff has a "severe medically determinable physical or medical impairment" that lasts for at least 12 months, (3) determination of whether Plaintiff's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, (4) determination of whether Plaintiff's RFC indicates an incapacity to perform the requirements of his past relevant work, and (5) determination of whether, given Plaintiff's RFC "age education and work experience," Plaintiff can "make an adjustment to other work." 20 C.F.R. § 404.1520(4)(i-v).

At step one, if the Plaintiff is engaged in "substantial gainful activity" within the claimed period of disability, there is no disability during that period. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ determined Plaintiff had "not

engaged in substantial gainful activity since March 7, 2008, the alleged onset date."  Tr. 11.

At step 2, if the Plaintiff does not have a "severe medically determinable physical or mental impairment" that lasts at least 12 months, there is no disability.  20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ found Plaintiff had the following severe impairments:  "nonalcoholic steatohepatits (NASH), depression, passive-dependent personality disorder, with hysteriod qualities, status post abdominal surgeries and allergies."  Tr. 11.

At step 3, if the Plaintiff's impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and last at least 12 months, the Plaintiff is deemed disabled.  20 C.F.R. § 404.1520(e).  The ALJ found Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1."  Tr. 11.

Before proceeding to step 4 and 5, the ALJ must determine the Plaintiff's RFC.  RFC is the "most" a person "can still do" despite their limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ found Plaintiff had the following RFC:

the . . . capacity to perform light work as
defined in 20 C.F.R. 404.1567(b) except she
can lift and carry 20 pounds occasionally
and ten pounds frequently.  She can perform
more than simple and repetitive work but
cannot be required to pay close attention
[to] details.  She can tolerate superficial
contact with the public and work at a
regular pace.

Tr. 13.

At step 4, if, given Plaintiff's RFC, Plaintiff can still
perform their past relevant work, there is no disability.  20
C.F.R. § 404.1520(a)(4)(iv).  The ALJ found the Plaintiff was
"unable to perform any past relevant work."  Tr. 16.

At step 5, if, given Plaintiff's RFC, age, education, and
work experience, the Plaintiff can make an adjustment to other
work, there is no disability.  20 C.F.R. §§ 404.1520(a)(4)(v).
This step requires the ALJ to provide "evidence" that the
Plaintiff could perform "other work [that] exists in
significant numbers in the national economy."  20 C.F.R. §
404.1560(c)(2).  In other words, at step 5, the burden of
proof shifts from the Plaintiff to the Commissioner of the
SSA.  <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1168 (8th Cir.
1984).  At the administrative level, an ALJ generally calls a
Vocational Expert (VE) to aid in determining whether this
burden can be met.

The ALJ found that there were "jobs that exist in significant numbers in the national economy" that the Plaintiff could perform. Tr. 17. The ALJ's determination was based on the VE's response to an initial hypothetical, consisting of the ALJ's RFC finding. Tr. 17. Specifically, the VE testified that a hypothetical person with the RFC the ALJ assigned to Plaintiff could work as a personal attendant, medical receiving clerk, or remittance clerk. Id.

**B. Standard of Review**

This Court's role in review of the ALJ's decision requires a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Owen v. Astrue, 547 F. 3d 933, 935 (8th Cir. 2008). Substantial evidence is less than a preponderance but enough that a reasonable mind might find it adequate to support the conclusion in question. Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008) (citing Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007)). This Court must consider both evidence that supports and detracts from the ALJ's decision. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (citing Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)). In applying this standard, this Court will not

reverse the ALJ, even if it would have reached a contrary decision, as long as substantial evidence supports the ALJ's decision. <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004). The ALJ's decision shall be reversed only if it is outside the reasonable "zone of choice." <u>Hacker v. Barnhart</u>, 459 F. 3d 934, 936 (8th Cir. 2006) (citing <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994)).

This Court may also ascertain whether the ALJ's decision is based in legal error. <u>Laurer v. Apfel</u>, 245 F.3d 700, 702 (8th Cir. 2001). If the ALJ applies an improper legal standard, it is within this Court's discretion to reverse his/her decision. <u>Neal v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005); 42 U.S.C. 405(g).

## C. Plaintiff's RFC and the Medical Evidence

An ALJ's RFC assessment is crucial for determining whether a plaintiff is disabled. It has been referred to as the "most important issue in a disability case . . . ." <u>Malloy v. Astrue</u>, 604 F. Supp. 2d 1247, 1250 (S.D. Iowa 2009) (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982)(en banc)). A plaintiff's RFC is a function-by-function assessment of the most a plaintiff can still do despite his or her impairments. S.S.R. 96-8P, 1. When determining RFC, the

ALJ must consider all of a plaintiff's impairments, even those which are not deemed severe, as well as limitations which result from symptoms, such as pain. § 404.1545(a)(2) and (3). RFC is "not the ability merely to lift weights occasionally in a doctor's office . . . it is the ability to perform the requisite physical acts . . . in the real world." Malloy v. Astrue, 604 F. Supp. 2d at 1250 (quoting 683 F.2d at 1147).

An RFC, though crafted by an ALJ, is ultimately a medical question that should be based in the medical opinions on record. Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010). The regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of . . . impairment(s)." 20 C.F.R. § 404.1527(a)(2). If the medical evidence on record is inconsistent, an ALJ has a duty to weigh the evidence. § 404.1527(c)(2). In aid of this task, the regulations create a general hierarchy of medical evidence, distinguishing the relative weight various sources of medical evidence should be given. § 404.1527(d). At the top of the hierarchy are opinions from treating physicians, next are non-treating, examining source opinions, and, finally, there are opinions from non-examining sources, such

as state consultants, whose opinions are limited to a review of a plaintiff's medical history.  Id.

Of course, this hierarchy is not absolute.  The opinions of treating physicians are not automatically given more weight than the opinions of examining and non-examining physicians. The regulations go on to discuss a number of factors to be considered when assessing the weight of medical opinions.  § 404.1527(d)(2)-(6).  For instance, treating opinions should be viewed in light of the "[l]ength of the treating relationship and frequency of examination," as well as the "[n]ature and extent of the [treating] relationship," including the type of treatment provided  and "the extent of examinations and testing . . . provided."  § 404.1527(d)(2).  In addition, treating, examining, and non-examining source opinions should all be evaluated in terms of the relevant evidence used to support the opinion, the internal consistency of the opinion, the specialization of the source of the opinion, and other factors a plaintiff or others bring to the attention of the Commissioner.  § 404.1527 (d)(3)-(6).

The Plaintiff's brief contends the ALJ failed to properly weigh the medical evidence when determining Plaintiff's RFC. Specifically, Plaintiff contends the ALJ failed to give appropriate weight to Dr. Lorentson and Dr. Rogers' medical opinions.

### 1. Dr. Lorentson's Opinion

Dr. Lorentson, who specializes in internal medicine, treated Plaintiff from May of 2007, to January of 2009, when Plaintiff was repeatedly hospitalized for severe abdominal pain. Tr. 347, 366, 387-89, 543; *Dr. John Lorentson MD*, U Compare Health Care, http://www.ucomparehealthcare.com/drs/john_lorentson/hospital.html, last visited, January 4, 2012. As previously mentioned, on March 20, 2008, Dr. Lorentson wrote the SSA on behalf of Plaintiff. Tr. 411. He indicated Plaintiff had "severe intractable abdominal pain due to her [NASH] over the past year . . . which [had] limited her ability to work and enjoy life." Id. Dr. Lorentson continued on to note that Plaintiff's functional limitations plummeted when she was having an attack of abdominal pain, and these attacks were "unfortunately quite frequent." Id. Overall, Dr. Lorentson concluded the extreme debilitating effects of her attacks left her "totally disabled." Id.

26

The ALJ's only criticism of Dr. Lorentson was that he "relied quite heavily on the subjective report of symptoms and limitations provided by the [Plaintiff] and seemed to uncritically accept as true most, if not all, of what the claimant reported." Tr. 15. On its surface, this criticism is unreasonable and not supported by substantial evidence on the record as a whole. Dr. Lorentson treated Plaintiff when her pain was severe enough to require hospitalization. Though the record indicates the intensity of Plaintiff's pain was never fully explained to the satisfaction of some of her doctors, it is clear that all of her doctors agreed that her hospitalization was more likely than not related to her underlying liver condition. Tr. 347, 366, 387-89, 543. When hospitalized in November of 2007, the record indicates her increase and decrease in pain corresponded to an expected rise and fall of liver function. Tr. 356. Dr. Johlin had indicated that Plaintiff's level of pain, though rare in relation to her underlying condition, was not completely out of the ordinary. Tr. 360. Furthermore, regardless of the underlying cause, it is clear Plaintiff's symptoms were quite real. The record indicates that, during most of her hospitalizations, Plaintiff could not hold down food and

27

doctors had to give her fluids and nutrients intravenously. Tr. 347, 366, 379, and 389. As previously noted, when Plaintiff was hospitalized on January 11, 2009, she had 11 loose stools in a day, difficulty eating, and a high temperature of 104 degrees Fahrenheit, hardly the kind of symptoms a patient can fake. Tr. 537. Finally, Dr. Lorentson was only one of three doctors to treat Plaintiff when she was hospitalized at Trimark; Dr. Marner and Dr. Schminke also treated Plaintiff, and neither expressed any doubt that Plaintiff's pain was anything other than what she claimed. Tr. 360 and 537. The ALJ's decision to ignore the opinions of medical professionals who hospitalized and treated Plaintiff, when the ALJ himself was not present, falls well outside the reasonable zone of choice.

The Defendant's brief argues that an opinion that a Plaintiff is disabled is an administrative decision that must be left to the Commissioner. Docket No. 9, 14. While the Defendant accurately describes the base rule, it continues on to stress that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner." S.S.R. 96-5P, 2. Naturally, a doctor's opinion that a plaintiff is

disabled is not somehow discredited based on the doctor's unhedging clarity. On the contrary, such an opinion should be given more consideration, even if that consideration ends in a reasonable explanation of why the opinion was not given great weight.

Again, the gist of Dr. Lorentson's opinion was that the "unpredictability" of Plaintiff's acute attacks rendered her incapable of holding a job. Tr. 451. The ALJ's RFC finding simply fails to give any credence to that opinion, i.e. it does not include any reference to the debilitating effect of her severe attacks. Given Dr. Lorentson's hours spent examining and treating the Plaintiff in the controlled setting of a hospital, his experience with her functional limitations during her frequent periods of crisis, and his extensive notes documenting the nature of her condition during her attacks, it is difficult to understand why the ALJ failed to give his opinion any weight.

### 2. Dr. Rogers

As previously noted, Dr. Rogers examined and then completed a psychological assessment of Plaintiff at the request of Disability Determination Services. Tr. 450. Dr. Rogers noted Plaintiff suffered from depression related to her

severe pain and assigned her a GAF score of 55, which indicates moderate difficulties in occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision 2000). In relation to Plaintiff's specific functional limitations, Dr. Rogers concluded her pace was poor; she could not "concentrate well enough to be reliable in carrying out instructions;" she was able "to interact appropriately with supervisors, coworkers, and the public" for only "brief periods;" and her ability to "adjust adequately to changes in the workplace . . . would be compromised by her constant pain." Tr. 14.

The ALJ's RFC finding indicated only that Plaintiff could not "be required to pay close attention [to] details," and could tolerate only "superficial contact with the public." Tr. 13. Noticeably absent in the ALJ's assessment is Dr. Richards' findings of poor pace, an inability to reliably carry out instructions, and a compromised ability to adjust to changes in the workplace.

The ALJ gave two reasons for giving "minimal weight" to Dr. Rogers' opinion: (1) Dr. Rogers only examined the Plaintiff "on one occasion" and (2) Dr. Rogers' findings were

"not consistent with his own examination results."

Given that Dr. Rogers was the only medical opinion on record that both examined and made findings related to Plaintiff's mental functional capacity, the ALJ's first reason for giving minimal weight to Dr. Rogers' opinion makes little sense. There were no other conflicting opinions from examining physicians on record. The ALJ in fact adopted the opinion of Dr. Notch, who never examined Plaintiff, and, as such, via the ALJ's own reasoning, should have been given less weight.

As to the ALJ's second justification, it is true that Dr. Rogers' examination results did not always reflect the severity of his conclusions, but what the ALJ construes as inconsistencies, this Court is convinced was thoughtful analysis. Dr. Rogers was accounting for the fact that Plaintiff could at times function quite normally, but, due to the nature of Plaintiff's condition, at other times, could not function at all. The record is clear; Plaintiff's pain varied greatly, and a medical opinion that accounts for this is more, rather than less, accurate. Common sense dictates that pain, especially in Plaintiff's case, is not a laboratory constant.

### 3. The Opinions of Non-Examining Consultants

The ALJ's RFC assessment tracks the findings of Dr. Notch and Dr. Wilson, the two non-examining consultants on record. The regulations require an ALJ to "evaluate" the opinions of state agency medical consultants in the same manner as other medical opinion evidence is to be evaluated and, additionally, to "explain in the decision the weight given" them. 20 C.F.R. § 404.1527(f)(2)(ii). This simply did not happen in this case. The ALJ only briefly noted that the state agency medical consultants' opinions supported his decision, which can hardly be characterized as an evaluation. Tr. 16.

As previously noted, "the opinions of nonexamining sources are generally, but not always, given less weight than those of examining sources." Wilcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008). Furthermore, the Eighth Circuit has a long standing rule that "the opinion of a consulting physician alone does not generally constitute substantial evidence."[26] Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th

---

[26] This Court is aware that the ALJ adopted the opinions of two non-examining consultants and not one consultant "alone," but, since Dr. Wilson dealt solely with physical functional limitations and Dr. Notch dealt solely with mental functional limitations, the totality of the ALJ's RFC finding essentially relies upon non-examining, consultative opinions standing "alone," i.e. without additional support on record.

Cir. 2002) (citing <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir.

2001).   Since Dr. Notch only dealt with Plaintiff's mental

limitations, Dr. Wilson only dealt with Plaintiff's physical

limitations, and there is no other medical opinions on record

supporting their findings, their opinions stand alone and, as

opinions of non-examining consultants, should not have been

afforded the status of substantial evidence on the record as

a whole.   Application of this rule is particularly persuasive

in this case, because other sources, who treated and examined

Plaintiff, give opinions that were consistent with disability.

Furthermore, after thorough review of Dr. Notch and Dr.

Wilson's RFC assessments, this Court feels that, once the

regulatory guidelines for evaluating opinion evidence are

applied, their opinions have very little indica of

reliability.   Dr. Notch's assessment consisted of a check the

box form.   Only briefly at the end of his assessment did he

explain his findings, and, even then, he limited himself to a

laundry list of Plaintiff's psychological treatment history.

He provided no basis for why his opinion varies from that of

Dr. Rogers, nor any analysis as to why Plaintiff's treatment

history necessitates his conclusions.

Dr. Wilson also filled out a check the box form.   Though

Dr. Wilson completed his assessment after Dr. Lorentson wrote the SSA to express his opinion related to Plaintiff's functional limitations and "total disability," Dr. Wilson indicated there were no statements regarding claimant's physical capacities on file. Tr. 477. An ALJ has a duty "to fully and fairly develop the record" prior to making a decision. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). This duty requires that a consultative examiner be given "any necessary background information" for purposes of forming an opinion about the functional limitations caused by a Plaintiff's impairments. 20 C.F.R. § 404.1517. Simply stated, Dr. Wilson lacked the information necessary to form a valid opinion. In Mateer v. Bowen, this Court recognized that a consultative report made without review of the available medical evidence is of "little or no value." 702 F. Supp 220, 222 (S.D. Iowa 1988). Finally, given that Dr. Wilson indicated there was no information on file relating to Plaintiff's functional capabilities, and Dr. Wilson never examined Plaintiff, his assessment is, at the very least, highly suspect, if not obsolete.

### 4. The ALJ's Reasoning

The ALJ raised some generalized arguments in support of

his RFC finding: (1) objective medical evidence supports his finding; (2) Plaintiff has a limited and conservative treatment record; and (3) Plaintiff failed to comply with her treatment.

The ALJ failed to identify the objective evidence that supports his RFC, but, as discussed above, the weight of the evidence, including the opinions of Dr. Lorentson and Richards, clearly support an RFC significantly lower than that found by the ALJ.

This Court has also considered that the ALJ's first justification may have been intended to imply that the Plaintiff's symptoms were not related to an actual underlying physical or psychological condition. For instance, Dr. Johlin indicated there might be a somatoform component to Plaintiff's illness, and Dr. Rogers indicated she exhibited "hysteroid and passive-dependent personality traits," but these observations do not call into question the legitimacy of the Plaintiff's symptoms. Tr. 280 and 452. In fact, they explain those symptoms. Somatoform Disorder and Dependent Personality Disorder are medically recognized psychiatric conditions and are not code for a lack of credibility. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental*

*Disorders*, 485 and 721 (4th ed., Text Revision 2000).
Regardless, as previously noted, there is also a good deal of
evidence on record that Plaintiff's symptoms resulted from her
liver disease, and no doctor on record who actually met
Plaintiff questioned her sincerity.

The ALJ also failed to explain what made Plaintiff's
treatment record conservative in nature. As noted above,
Plaintiff has taken Lexapro, Ultram ER, Hydrocodone,
Oxycontin, Amitriptyline, Betaine, Dyazien, Toprol XL, Nexium,
salmon oil, Synthroid, Urosidial, Temazapam, Lyrtec,
Singulair, Prednisone, and Claritin at one time or another for
an assortment of ailments.[27] Tr. 183 and 201. The record also
indicates Plaintiff has undergone 22 abdominal surgeries since
she was 18. Tr. 65. She has also sought treatment from the
University of Iowa, Trimark, and the Mayo Clinic. Tr. 262,
285, and 379. Finally, throughout a 2 year period, she was
hospitalized at least 7 times. Tr. 347, 356, 366, 387, 490,
and 537. This Court is unaware of what else could have been
done to treat Plaintiff, and, given the ALJ's silence on the
subject, he does not appear to know either.

---

[27] Please see pages 3 and 4 above for the general purpose
of the individual medications Plaintiff has taken.

The ALJ's final argument is that Plaintiff does not qualify for disability under the Act because she failed to follow through with her treatment. "Impairments that are controllable or amenable to treatment do not support a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). Dr. Johlin did indicate that, if Plaintiff improved her muscle mass and exercise tolerance, she could "avoid" her "pain and suffering," but this note was made in February of 2008, almost two years prior to the administrative hearing, and more recent evidence indicated Plaintiff was making a real effort to diet and exercise. Tr. 309 and 496. Furthermore, given the uncertain nature of the impairment causing Plaintiff's pain, it is unclear any doctor could have reasonably suggested a course of treatment which would have had a likelihood of alleviating Plaintiff's symptoms.

### 5. The Defendant's Independent Arguments

The Defendant has forwarded two arguments not included in the ALJ's reasoning in support of the ALJ's findings. Since the ALJ did not assert these arguments, this Court is concerned they may not be appropriate for consideration, and, even if they are, this Court has serious doubts that the substantial evidence on the record as a whole standard of

review should be applied.  See American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. 490, 439 (1981) (finding "*post hoc* rationalizations . . . cannot serve as a sufficient predicate for agency action").  Still, this Court is convinced, even if Defendant's new arguments are afforded the same deference as arguments presented by an ALJ, substantial evidence on the record as a whole does not support them.

The Defendant first argues that, once Plaintiff began to follow her dietary and exercise instructions, her bouts of severe pain decreased.[28]  Docket No. 9, 12.  The record indicates Plaintiff was following her diet and exercise program "vigorously" by early June of 2008 and yet was hospitalized later that month.  Tr. 490.  Plaintiff was again hospitalized in January of 2009.  Clearly, diet and exercise did not eliminate Plaintiff's condition or even alleviate it to such an extent that periods of hospitalization were no longer necessary.  Defendant also points to Trimark check up notes from April of 2009, indicating Plaintiff's condition was "stable," but "stable" simply indicates Plaintiff's condition

---

[28] Notably, this directly contradicts the ALJ's assertion that Plaintiff failed to follow her suggested diet and exercise, and this Court is concerned about the fairness of forcing a Plaintiff to answer two contradictory justifications for a finding of no disability.

38

was not getting worse. Docket No. 9, 12. There is absolutely no evidence on record indicating Plaintiff was getting better, and the absence of evidence cannot constitute substantial evidence on the record as a whole. Coulston v. Apfel, 224 F.3d 897, 901 (8th Cir. 2000) (Bye, Circuit Judge, concurring). Monthly hospitalizations are not a prerequisite to a finding of disability, and this Court does not consider Plaintiff's decrease in hospitalizations to constitute substantial evidence on the record as whole that Plaintiff was improving to the point that she could compete for full-time employment in the national economy.

The Defendant also argues the record does not support Plaintiff's "allegations of debilitating functional limitations lasting more than 12 months." Docket No. 9, 11. In support of this argument, Defendant notes Plaintiff was able to work until March of 2008, despite frequent emergency room visits due to her debilitating pain. Id. However, Plaintiff was only working five hour shifts as of 2005, and her illness clearly interfered with her ability to attend work regularly. Tr. 279. Further, the ALJ specifically found that Plaintiff had numerous severe impairments lasting 12 months or more and could not, despite a faulty RFC determination,

perform her past relevant work in accordance with the VE's testimony, and this Court agrees. Tr. 11 and 16.

Though Plaintiff was able to continue to work for her employer after she started to get sick, this Court refuses to equate that with an ability to find other full-time work that exists in significant numbers in the national economy once she lost her job. Finally, Plaintiff testified that her pain got progressively worse after she was fired from her job. Tr. 63.

**D.   Lay   Observations   of   Plaintiff's   Functional Limitations and Plaintiff's RFC**

As previously discussed in the facts section, the Plaintiff has consistently indicated that she regularly experiences severe pain. Plaintiff described relatively constant pain with periods of severe pain 3 to 4 time a month for up to 4 to 5 days at a time. Tr. 56. She described the severe pain as though someone were "stabbing" her and "running a knife back and forth." Tr. 55. On her bad days, she claims her pain completely debilitated her. Tr. 56.

An ALJ must consider lay observations of a Plaintiff's limitations, including limitations attributable to a Plaintiff's subjective accounts of pain or other symptoms. 20 C.F.R. § 404.1545(a)(3). Based on the general substantial evidence on the record as a whole standard of review, a

District Court should defer to an ALJ's determination that a plaintiff's allegations lack credibility "as long as the ALJ explicitly discredits a [plaintiff's] testimony and gives a good reason for doing so." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)).

The ALJ gave three reasons for giving little credibility to Plaintiff's subjective allegations of pain:  (1) Plaintiff engaged in extensive daily activities; (2) the medical record does not support Plaintiff's subjective allegations; (3) and Plaintiff was fired from her job for reasons other than medical.  Tr. 14.

In support of his first reason, the ALJ listed a number of daily activities Plaintiff admitted to engaging in as evidence undermining Plaintiff's claimed functional limitations.  Tr. 14.  "Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001).  While this Court agrees that the daily activities Plaintiff was able to perform are, in most cases, inconsistent with a finding of disability, the ALJ simply failed to consider the facts of the case before him and instead employed

stock reasoning typically used in cases where plaintiffs' have constant back pain or some other persistent illness. Tr. 14. As previously noted, in this case, the record indicates Plaintiff's pain is severe on 4 or 5 occasions a month for 4 or 5 days at a time. The record also indicates that, though she is capable of numerous daily activities, she requires numerous breaks throughout the day. Tr. 166. Finally, the Plaintiff has been repeatedly hospitalized throughout 2008 and 2009, indicating her condition crescendos and is frequently, completely debilitating. The question at step five of the sequential evaluation process is not whether Plaintiff can occasionally work, it is whether Plaintiff "can perform full-time competitive work." <u>Hogg v. Shalala</u>, 45 F.3d 276, 278 (8th Cir. 1995) (citation omitted). In the context of this case, there is nothing inconsistent about Plaintiff's description of her daily activities and her description of the nature of her primary impairment and the pain related thereto.

The ALJ's second reason for doubting Plaintiff's subjective allegations, i.e., her allegations are not supported by the objective medical evidence, has already been considered. As noted above, when the objective medical evidence is properly weighed in accordance with the regulatory

guidelines, it supports, rather than detracts from Plaintiff's subjective allegations.

As to the ALJ's third reason, the record does indicate Plaintiff was fired from her last job due to false allegations she made against a co-worker. "The fact that a claimant left a job for reasons other than her medical condition is a proper consideration in assessing credibility." <u>Medhaug v. Astrue</u>, 578 F.3d 805, 816-17 (8th Cir. 2009). While a propensity to file false claims may ordinarily shed doubt on a plaintiff's credibility, the Plaintiff, throughout the disability determination process, was forthcoming about her mistake, indicating she accepted and regretted the incident and was otherwise being truthful. In addition, the record indicates her actions may have been directly related to an allergic reaction she had to Novocain after a trip to the dentist. Tr. 55.

Furthermore, filing an impulsive, false complaint against a co-worker does not equate to attempting to mislead the SSA. First, Plaintiff misrepresentations did not relate to her illness. Second, Plaintiff, over the years, has filled out several documents swearing that her allegations are true and has been consistent through out. She has also gone through

repeated hospitalizations, filled out form after form, attended an administrative hearing, and filed two appeals, all of which would require careful and extended deception, while the incident leading to her being fired from her last job was clearly impulsive and may have lacked intent. Finally, if peoples' trustworthiness were judged in accordance with their most shameful hours, none among us would have credibility. For all these reasons, this Court is persuaded the incident that precipitated Plaintiff being fired from her last job is not a good reason for doubting her credibility in relation to her subjective allegations of her pain and resulting functional limitations.

Though unimportant to this Court's final decision in this Order, this Court is persuaded it is necessary to note that the ALJ erred in not encouraging the testimony of Plaintiff's husband. Specifically, Plaintiff's attorney told the ALJ the husband was at the hearing to testify regarding Plaintiff's functional limitations due to her allergies. The ALJ then stated he had "no reason to doubt that she does what she does." Tr. 65. The attorney then responded, "Then, I don't need to call him, Your Honor." Id. At which point, the hearing continued without testimony from the husband. While

this may have been a simple misunderstanding, this Court understands why the Plaintiff's attorney took the ALJ's statements to mean that he accepted the Plaintiff's description of her impairments and found her credible and so no further evidence was necessary.  The Eighth Circuit has "frequently criticized" the failure of an ALJ "to consider subjective testimony of family and others," and in this case, the actions of the ALJ foreclosed this possibility.  <u>Smith v. Heckler</u>, 735 F.2d 312, 317 (8th Cir. 1984).

**IV.  CONCLUSION**

It is clear the ALJ erred in several respects.  The question then becomes whether this Court should remand for further consideration or solely for the purpose of awarding benefits.  This Court has the authority to reverse a decision of the Commissioner, "with or without remanding the cause for rehearing."  42 U.S.C. § 405(g).  However, the Eighth Circuit has held that a remand for award of benefits is appropriate only where "the record 'overwhelmingly supports'" a finding of disability.  <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1011 (8th Cir. 2000) (citing <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992).  However, "[w]here . . . a rehearing would simply delay receipt of benefits, reversal is appropriate."  <u>Tennant</u>

v. Schweiker, 682 F.2d 707, 710 (8th Cir. 1982).

This Court is persuaded the record overwhelming supports a finding of disability as of June 3, 2008, when Plaintiff began to follow the medical advice of her doctors but her impairments persisted. Plaintiff was clearly, frequently, and completely debilitated due to her NASH; and the ALJ failed to properly weigh the medical evidence and improperly discredited Plaintiff's subjective allegations. **Therefore, the Commissioner's decision is reversed and remanded solely for the calculation of benefits.**

**IT IS SO ORDERED** this 9th day of January, 2012.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa